

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-15-00041-CR
### NO. 02-15-00042-CR
### NO. 02-15-00043-CR
### NO. 02-15-00044-CR

RAUL MIRABAL                                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NOS. 1309930D, 1309990D, 1310195D, 1310196D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Raul Mirabal appeals his convictions for aggravated assault with a deadly weapon, unlawful restraint, and aggravated sexual assault and three convictions for violations of a protective order. Mirabal raises five issues

---

[1]See Tex. R. App. P. 47.4.

challenging the sufficiency of the evidence, the exclusion of a text message from evidence, and the propriety of the jury charges given. We will affirm.

## II. FACTUAL BACKGROUND

The complainant met Mirabal when she was six years old; her father married Mirabal's sister Lourdes. The complainant and Mirabal started dating in 1997 when she was fifteen years old; they married in 2004, and their son M.M. was born in 2009. By April 2012, the complainant had moved out of the marital residence, but she was still married to Mirabal.

On April 28, 2012, Mirabal kept M.M. while the complainant attended a coworker's wedding. When the complainant went to pick up M.M. from Mirabal, Mirabal was upset and pushed the complainant to the ground, scratched her face with his hand, and hit the back of her head.[2] Mirabal then followed the complainant to Lourdes's house, where the complainant was living at the time. The complainant reported the incident to the police.

Shortly after the April incident, the complainant filed for divorce and a protective order. The complainant testified that she felt the need to file for divorce and a protective order to protect herself and M.M. because Mirabal's anger was escalating. The complainant testified that she did not follow the protective order "to a T." The protective order allowed Mirabal to see M.M. on

---

[2]The complainant suffered internal bleeding in her right eye, bruising and scratch marks on the side of her face, and bruising on her ear. Photos of the complainant's injuries were admitted into evidence.

Thursdays after school until 8:00 or 8:30 p.m., but the complainant allowed Mirabal access to M.M. "pretty much anytime he requested" when Mirabal did not seem to be in an agitated mood. The protective order required M.M. to be picked up and dropped off at McDonald's, but the exchanges happened at Mirabal's home because Mirabal refused to go to McDonald's.

On January 4, 2013, while Lourdes was watching M.M. for the complainant before she arrived home from work, Mirabal took M.M. from Lourdes's home. The complainant testified that she was not comfortable with Mirabal having M.M. with him on that day; she had talked to Mirabal earlier in the day, and he was very upset because he had learned that the complainant was in a relationship with another man. The complainant called Mirabal, but he was not agreeable to meeting at McDonald's to allow her to pick up M.M. The complainant told Mirabal that she would pick up M.M. the following morning at 9:00 a.m.

The next morning, Mirabal called the complainant around 7:45 a.m. and told her that she could come and pick up M.M. The complainant arrived at Mirabal's home in Hurst around 8:00 a.m. The complainant did not plan to go inside, but Mirabal told her that M.M. was eating in the kitchen, that she should come inside, and that she "had nothing to worry about."

Once the complainant entered Mirabal's home, he started yelling at her, telling her that she had ruined their family and was a whore. She told him that she was sorry, that she did not want to talk to him about her relationship with another man, and that she wanted to leave. Mirabal pushed her into a chair and

3

told her that they were going to talk. The complainant got M.M. ready to leave, grabbed M.M.'s belongings, and headed to the front door. Mirabal told the complainant to sit down, so she did. Mirabal talked about going away somewhere but was vague and did not have a plan.

The complainant tried to leave again but realized that the door had been locked. When she tried to unlock the door, Mirabal grabbed her from behind, threw her into a corner, and repeatedly punched her in both eyes. The complainant testified that she felt severe pain. M.M. was standing nearby and picked up rocks from a potted plant and threw them at Mirabal. The complainant testified that M.M. screamed, "Daddy, please stop, please stop hitting [M]ommy."

Mirabal said that he wanted to bring her into the bedroom, that he had a gun in there, and that he wanted to kill her in the bedroom. Mirabal started dragging the complainant by her clothes toward the bedroom; she wiggled away, ripping her tank top and bra, and tried to grab a cell phone to call 9-1-1, but she was unable to unlock the phone to make the call. Mirabal threatened her saying that he would break her phone and that she would not call 9-1-1.

Mirabal grabbed the complainant by the hair so that she could not get away, threw her into the hallway wall, and then dragged her by her hair into the bedroom. Mirabal pulled a large handgun from underneath the mattress, held it near the complainant's head, and said that he was going to kill her and that "this is it." The complainant begged and pleaded with Mirabal to not kill her because she was M.M.'s mother; the complainant testified that she was very afraid that

4

Mirabal would hit her with the gun and then shoot her. Mirabal said that she was right about being M.M.'s mother and that he was going to put a bullet through M.M.'s head first and make her watch because that would hurt her more. The complainant ran toward M.M. to try to cover him in any way that she could, but Mirabal grabbed her, threw her into another corner, and again repeatedly punched her face.

When Mirabal got up and walked toward M.M., the complainant got up. Mirabal turned around, put his hands on her neck, placed her over a table, and screamed that he did not need a gun to kill her; the complainant believed that Mirabal was implying that he could choke her to death. Mirabal then became sick and vomited.[3] He told her that he wanted to go lie down and that she was going to come with him. The complainant realized that she was not fast enough or strong enough to get away, that he had a gun, and that he was "a very good shot," so she went into the bedroom with him. The gun was on the bed, and she picked it up and threw it into the corner where there was a pile of clothes. She then sat next to Mirabal on the bed; rubbed his back; and told him that they could forgive each other, that they could make this work, and that he did not need to worry about the injuries to her face because she worked from home.

Ultimately, the complainant convinced Mirabal that she needed to go to her apartment in Grapevine because she did not have a shirt and bra and needed to

---

[3]The complainant testified that Mirabal is diabetic and had previously thrown up because of fluctuations in his blood-sugar levels.

shower to wash the blood out of her hair and to change so that they could go away somewhere like he wanted. Mirabal agreed, and he left with her and M.M. The complainant testified that while they were in the car, she was afraid that Mirabal might have the gun[4] with him and therefore did not feel like she could stop for help.

When they arrived at the complainant's apartment, she took a shower to wash the blood out of her hair. After the complainant showered, Mirabal decided to shower and asked her to shower with him and to perform oral sex on him. He put his penis into her mouth, and she complied. She testified that the only reason she complied with Mirabal's demand was that she feared for her life and for M.M.'s life and that she believed Mirabal would further hurt her or hurt M.M. if she did not comply. The complainant testified that she did not feel free to leave her apartment because Mirabal was stronger and faster than her—due to the fact that she would be running with M.M. in her arms—and because Mirabal had a gun.[5]

After the shower, Mirabal said that he wanted to lie down and that the complainant was to lie down with him. She lay down; as she drifted in and out of consciousness, she listened to Mirabal's breathing to see if he was falling asleep.

---

[4]She testified that she believed that he could have concealed the gun under the sweatshirt he was wearing.

[5]The complainant testified on cross-examination that while they were at her apartment, she did not see the firearm that Mirabal had previously used to threaten her while they were at his house.

6

When he fell asleep, she was able to get to her phone in the living area and sent a text message to Lourdes asking for help.[6]

Immediately after the complainant sent the text, Mirabal came out to the living area and began berating the complainant and saying nasty things about her, her family, and her friends. The complainant testified that Mirabal "was just talking crazy" and mentioned other ways that he had considered killing her, such as sitting in the field in front of her apartment and shooting her through the window. M.M. asked Mirabal why he had hit his mom and said that "[M]ommy doesn't look pretty this way." Mirabal again brought up his idea of going away somewhere and said that he needed to go back to his home. The complainant offered him the keys, but he said that she had to go with him.

The complainant drove the three of them back to Mirabal's home. Because M.M. had fallen asleep, the complainant stayed in the car with him while Mirabal went inside his home to pack for the trip. The complainant texted Lourdes again. The complainant also texted her friend Severine a picture of her face[7] and told her that Mirabal "did this to me"; the complainant testified that if

---

[6]Lourdes testified that around noon on January 5, 2013, she received a text from the complainant stating that she and Mirabal were resting and that she was trying to make things right.

[7]Severine Williams testified that when she received the complainant's text, she was scared for the complainant. Severine called her husband and told him that they "had to do something because it was not going to go well." Severine said that when she saw the picture, she thought that she would not see the complainant again because the complainant would probably die.

7

she died that day, she wanted someone to know who had injured her. The complainant also called Severine's home because she knew her husband would be at home. The complainant told the jury that she was "really terrified that [Mirabal] was going to come out [and] see [her] on the phone" and that she did not want to call the police and have to provide a lot of information. Mirabal came out to check on her five minutes after he went inside to pack. The complainant testified that she did not feel safe to flee in her car because she was worried that Mirabal would get in his car and hit them or gun them down; she testified that she "just did not feel like [she] was going to get away."

Eventually, they headed back to the complainant's apartment for the complainant to pack for the trip. The complainant testified that Mirabal had a backpack with him and that she assumed that he had the gun. On the way back to the complainant's apartment, her friend Severine called, and Mirabal allowed the complainant to answer the phone. The complainant spoke casually with Severine and told her that she and M.M. were headed to the complainant's apartment. The complainant testified that Severine was upset because she had seen the picture that the complainant had texted to her.[8]

When Mirabal, the complainant, and M.M. arrived at the complainant's apartment, she carried M.M. from the car to her bed because he was still asleep. Around 5:30 p.m., the Grapevine Police called the complainant and asked her to

---

[8]Severine's husband ultimately called 9-1-1.

come outside with M.M.; she said that she could not. The police said that they would knock on the door and that if she did not answer, they would kick down the door; the complainant said, "[O]kay," and the conversation ended. The complainant told Mirabal that someone was at the door and that she did not want to answer the door because he would not want people to see her with her injured face. The complainant then went and laid down next to M.M., and Mirabal answered the door.

Detective Christopher Taylor with the Grapevine Police Department testified that when Mirabal opened the door, he was very calm. Detective Taylor asked if the complainant was inside the apartment, and Mirabal said no. Detective Taylor testified that he already knew the complainant was inside the apartment based on the phone call to her, so he performed a protective sweep of the apartment. Detective Taylor found a female lying in bed, cradling a child; the female identified herself as the complainant, and Detective Taylor immediately saw that she had two very swollen black eyes. When asked if Mirabal had inflicted her injuries, the complainant said that he had.

After learning that Mirabal had been arrested, the complainant opened his backpack to give the police his diabetes medicine and pulled out the gun that Mirabal had used to threaten her. The complainant asked if the gun was loaded, and one of the officers told her that it was fully loaded with one bullet in the chamber.

9

Detective Taylor testified that the complainant's injuries "were major [and] looked serious" and that he immediately called for medical help. An ambulance took the complainant to the emergency room. Detective Taylor went to the hospital and interviewed her. Detective Taylor testified that the complainant told him that when Mirabal asked her to perform oral sex on him, she "did it to calm the situation down because she felt that he would get upset and shoot her and [M.M.]" Detective Taylor said that the oral sex was not consensual.

The complainant was diagnosed with an orbital floor fracture or blowout; the bone around her eye socket was depressed five millimeters into her face.[9] She also had marks on her neck from Mirabal's choking her, bruising on her arm from his grabbing and holding her while he was hitting her face, and bruising and blood on the top of her head. Photographs of her injuries were admitted into evidence. It took three months for the complainant's face to heal from the injuries inflicted by Mirabal.

The complainant testified that she was scared for her life and for M.M.'s life the entire day on January 5, 2013, and did not think that she and M.M. were going to survive. The complainant said that she had fled town the day after the incident.

---

[9]Dr. James Alan Dennington, who treated the complainant in the emergency room, testified that substantial force is necessary to cause an orbital floor fracture or blowout. Dr. Dennington said that he referred the complainant to an ophthalmologist to evaluate her eye in case she required surgery and to an ear, nose, and throat doctor to manage the fracture.

Investigator Duane Stubblefield with the Grapevine Police Department interviewed Mirabal at 10:50 p.m. on the day of the incident. The interview was admitted into evidence and played for the jury. Throughout the interview, Mirabal mentions that he had an inability to control his anger, that "stupid little things" set him off, and that he was "losing control" during the fight with the complainant. Mirabal initiated the interview because he disagreed with the sexual assault charge. Mirabal believed that the oral sex the complainant performed on him was consensual. Mirabal admitted that he had hit the complainant and that the complainant had "swell[ed] up" as a result of the injuries she had sustained but downplayed his role, saying that he kept "blacking out," that there was only "ten seconds of fighting," and that they were both swinging. Mirabal also said that he never carried a gun but admitted that he had it that day for "intimidation."

After hearing the above testimony and reviewing the evidence, the jury found Mirabal guilty of the following: aggravated assault with a deadly weapon, to-wit: a firearm and unlawful restraint with risk of serious bodily injury in trial court case number 1309930D; violation of a protective order—assault (of the complainant) and violation of a protective order—assault (of M.M.) in trial court case number 1309990D; violation of a protective order—assault (for the aggravated sexual assault of the complainant) in trial court case number 1310195D; and aggravated sexual assault by threats and placing in fear in trial court case number 1310196D. The trial court assessed Mirabal's punishment and sentenced him to twenty years', ten years', ten years', ten years', ten years',

and forty-five years' confinement, respectively. Mirabal perfected these appeals from his convictions.

### III. SUFFICIENCY OF THE EVIDENCE

In his first issue, Mirabal argues that the evidence is insufficient to support the lack-of-consent element of his conviction for aggravated sexual assault. In his fifth issue, Mirabal asserts that the evidence is insufficient to support his convictions for violation of a protective order because the State failed to prove that the protective order was issued pursuant to chapter 85 of the family code as alleged in the indictment.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing

*Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246.

## B. Sufficiency Analysis—Aggravated Sexual Assault

Aggravated sexual assault is defined as intentionally or knowingly causing the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent and by acts or words placing the victim in fear that death or serious bodily injury will be imminently inflicted on any person or by acts or words occurring in the presence of the victim threatening to cause death or serious bodily injury of any person. Tex. Penal Code Ann. § 22.021(a)(1)(A)(ii), (2)(A)(ii)–(iii) (West Supp. 2015). Two of the statutory ways in which lack of consent may be alleged and proved are (1) when the actor compels the other person to submit or participate by the use of physical force or (2) when the actor threatens to use force or violence against the other person and if the other person believes that the actor has the present ability to execute the threat. *Id.* § 22.011(b)(1)–(2) (West 2011).

The indictment here alleged both of the statutory lack-of-consent circumstances set forth above; it alleged that the sexual assault occurred without the complainant's consent because Mirabal compelled her to submit or

13

participate by the use of physical force or violence or by threatening to use force or violence against her and because she believed that he had the present ability to execute said threat. *See Tinker v. State*, 148 S.W.3d 666, 671 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (defining circumstances constituting lack of consent).

Under a hypothetically correct jury charge, as authorized by the indictment in this case, in order to convict Mirabal of aggravated sexual assault, the State must have proven beyond a reasonable doubt that Mirabal intentionally or knowingly caused penetration of the complainant's mouth by his sexual organ without the complainant's consent and an aggravating element. *See* Tex. Penal Code Ann. § 22.021(a)(1)(A)(ii), (2)(A)(ii)–(iii).

Mirabal challenges the sufficiency of the evidence to establish the lack-of-consent element of the offense. He argues that "[i]t is undisputed that no overt threat occurred at the complainant's apartment. If the sexual act had occurred at [Mirabal's] house at or near the time that the complainant was being threatened and injured, the lack of consent would have been clear."

No requirement exists, however, that an actor's threat of physical force or violence be explicit, be made immediately prior to the sexual assault, or be made in the same location as the sexual assault in order to establish that the victim was compelled to submit or to participate in the assault based on the threat. *See Edwards v. State,* 97 S.W.3d 279, 291 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding evidence sufficient to support lack-of-consent element in

14

absence of explicit threat); *Garcia v. State*, 750 S.W.2d 922, 923 (Tex. App.—Corpus Christi 1988, no pet.) (holding evidence sufficient to support lack-of-consent element because prior instances of choking victim to attain compliance constituted implicit threat of violence for lack of compliance on subsequent occasion); *see also Avila v. State*, Nos. 05-08-01629-CR, 05-08-01630-CR, 2010 WL 779351, at *6–7 (Tex. App.—Dallas Mar. 9, 2010, no pet.) (not designated for publication) (holding evidence sufficient to support lack-of-consent element based on victim's testimony that she feared for her life even though beating, threats, and burns took place at one location and sexual assault took place at different location). Instead, the factfinder considers the totality of the factual circumstances in determining whether the victim consented. *Brown v. State,* 576 S.W.2d 820, 823 (Tex. Crim. App. [Panel Op.] 1978). In a sexual assault case, the uncorroborated testimony of the victim alone is sufficient to support a conviction if the victim informed any person, other than the defendant, of the alleged offense within one year of the date of the offense. Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2015); *Villalon v. State,* 791 S.W.2d 130, 133 (Tex. Crim. App. 1990).

Here, the complainant told Detective Taylor immediately after the offense that she did not resist the sexual assault "because she felt that [Mirabal] would get upset and shoot her and [M.M.]," and Detective Taylor said that the oral sex was not consensual. The totality of the circumstances, viewed in the light most favorable to the verdict, establish that prior to the sexual assault, Mirabal beat the

complainant's face, causing black eyes and fracturing her orbital socket; displayed a gun while threatening to kill the complainant; and threatened to kill M.M. Viewing the evidence in the light most favorable to the verdict and resolving all conflicts in the same light, the jury could rationally have concluded beyond a reasonable doubt from the totality of the factual circumstances that the complainant was compelled to submit to, or participate in, oral sex with Mirabal by his use of physical force or violence or by his threatening to use force or violence against her and that she believed he had the present ability to execute the threat. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Edwards,* 97 S.W.3d at 291. We overrule Mirabal's first issue.

### C. Sufficiency Analysis—Violations of Protective Order

One of the necessary elements of the offense of violation of a protective order under a hypothetically correct jury charge for that offense is proof of the statutory provision under which the order was granted. *See* Tex. Penal Code Ann. § 25.07(a)(1) (West Supp. 2015); *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App.), *cert. denied*, 558 U.S. 992 (2009). Mirabal's violation-of-protective-order indictments each allege that the protective order was issued "under authority of the Texas Family Code Chapter 85." Mirabal stipulated that "there was, in fact, a protective order in place" but asserts that the State failed to offer proof that the protective order was issued under the authority of Texas Family Code chapter 85 as alleged in the indictment.

16

Although there is no direct testimony that the protective order was issued under the authority of chapter 85 of the family code, the protective order itself was admitted into evidence without objection. An examination of the protective order shows that it was issued under Texas Family Code chapter 85. First, the protective order stated that "family violence has occurred and is likely to occur in the future," as required by Texas Family Code section 85.001(a). *See* Tex. Fam. Code Ann. § 85.001(a) (West 2014). And, in accordance with Texas Family Code section 85.022(b), the protective order prohibited Mirabal from, among other things, committing family violence; communicating directly with the complainant or M.M. in a threatening or harassing manner; communicating a threat through any person to the complainant or M.M.; communicating in any manner with the complainant except through her attorney save and except communicating with the complainant regarding issues of health, welfare, and safety of M.M.; engaging in conduct directed specifically toward the complainant or M.M., including following the complainant or M.M., that was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the complainant or M.M.; going to or near the residences or places of employment or business of the complainant; going to or near the residences, child-care facilities, or schools M.M. normally attends or in which M.M. normally resides; and possessing a firearm or ammunition. *See id.* § 85.022(b)(1)–(6) (West Supp. 2015). The protective order stated that it was effective for two years, as required by Texas Family Code section 85.025. *See id.* § 85.025(a) (West Supp. 2015). The

17

protective order included the warnings required by Texas Family Code section 85.026. *See id.* § 85.026 (West Supp. 2015). The protective order also required that a copy of the order be delivered to the sheriff, the "appropriate constable" of Dallas County, the Highland Park Police Department, and the Dallas Police Department, in accordance with Texas Family Code section 85.042. *See id.* § 85.042(a)(1)–(2) (West 2014).

Viewing the evidence in the light most favorable to the verdict in trial court case numbers 1309990D and 1310195D and resolving all conflicts in the same light, the jury could rationally have concluded beyond a reasonable doubt that the protective order Mirabal was charged with violating, which was admitted into evidence, was issued under Texas Family Code chapter 85. *See Gaw v. State*, No. 05-08-00463-CR, 2009 WL 5193931, at *6 (Tex. App.—Dallas Dec. 17, 2009, no pet.) (not designated for publication) (holding evidence sufficiently established protective order had been issued under Texas Family Code chapter 85 based on "a comparison of the protective order to the applicable provisions of chapter 85"). We overrule Mirabal's fifth issue.

## IV. EXCLUSION OF EVIDENCE

In his second issue, Mirabal argues that the trial court erroneously excluded testimony about a text message the complainant sent to Mirabal's sister Lourdes. Mirabal contends that the text message was relevant to the issue of the complainant's consent to the sexual assault.

18

On direct examination, the complainant testified that when Mirabal drifted off to sleep after the two showered, she sent a text message to Lourdes asking for help. On cross-examination of the complainant, the defense asked about the content of the text—implying that the text said that she and Mirabal were resting and were trying to work things out. The trial court sustained the State's hearsay objections. But during Mirabal's case in chief, he called Lourdes to testify and asked her, "[Y]ou recall getting a text from [the complainant] that day telling you that they were resting and she was trying to make things right. Do you recall that?" Lourdes answered, "Yes."

For purposes of our analysis, we assume without deciding that the trial court's rulings—sustaining the State's hearsay objections to the questions posed to the complainant by defense counsel about the text message to Lourdes—were erroneous. Because any error in excluding this evidence is not constitutional, rule 44.2(b) applies. Tex. R. App. P. 44.2(b); *see Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007) (determining that exclusion of evidence supporting defendant's defensive theory was nonconstitutional error). Under rule 44.2(b), we must disregard an error unless a defendant's substantial rights are affected. *Id.* A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence

the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

As set forth above, the testimony that Mirabal argues was wrongly excluded was later admitted without objection during the defense's direct examination of Lourdes; this mitigates against the harmfulness of any error in excluding the content of the text during the complainant's testimony. *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (explaining that harm from the erroneous exclusion of evidence may be mitigated by the admission of similar evidence), *cert. denied*, 526 U.S. 1070 (1999); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) (same). Moreover, Mirabal's defensive theory that he and the complainant were trying to work things out in their marriage and that any sexual contact between them was consensual was controverted by the complainant's testimony that she felt trapped and was

20

fearful of losing her life, his admission that he had displayed the .50-caliber handgun to intimidate her, and his admission that he had inflicted her injuries—including the orbital floor fracture and multiple contusions on her face, head, and neck. Viewing the record as a whole, the character of the alleged error, the State's theory, Mirabal's defensive theory of consent, the jury charges, whether the State emphasized the alleged error, and closing arguments, we have fair assurance that any error stemming from the exclusion of the complaint's testimony about the content of one text message did not influence the jury or had but a slight effect. *See* Tex. R. App. P. 44.2(b); *Solomon*, 49 S.W.3d at 365; *see also Motilla*, 78 S.W.3d at 355 (setting forth scope of harm analysis). We overrule Mirabal's second issue.[10]

## V. ALLEGED JURY CHARGE ERROR

The trial court charged the jury on Mirabal's six offenses in four separate jury charges. In his third issue, Mirabal contends that he was prejudiced because the court's charge in the aggravated sexual assault case (our cause 02-15-00044-CR) provided a different definition of aggravated sexual assault than

---

[10]To the extent Mirabal's complaint may be construed as an improper-limitation-of-cross-examination argument, this objection was not made in the trial court and is not preserved. *See* Tex. R. App. P. 33.1(a)(1); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that an objection at trial is required to preserve error on Confrontation Clause grounds), *superseded on other grounds by statute*, *cert. denied*, 531 U.S. 1128 (2001); *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (holding that reviewing court should not address the merits of an issue not preserved for appeal).

21

the charge in the violation of protective order case (our cause 02-15-00043-CR). Mirabal concedes that he did not object to the jury charge in either case, and he does not claim that either of these individual jury charges is erroneous. Instead, Mirabal argues that because the respective abstract paragraphs of these two charges contain different manners of committing the same statutory offense, if taken together, they could have caused the jury to "have [been] confus[ed]" and to have convicted him on a theory not indicted.

The indictment in the aggravated sexual assault case alleged as the aggravating element that Mirabal by acts or words placed the complainant in fear that death or serious bodily injury would be imminently inflicted on her or that by acts or words occurring in her presence he threatened to cause death or serious bodily injury to any person. *See* Tex. Penal Code Ann. § 22.021(a)(1)(A)(ii), (2)(A)(ii), (iii). The indictment did not allege as the aggravating element that a deadly weapon was used or exhibited. Consequently, in the aggravated sexual assault case, the jury was not charged on the use or exhibition of a deadly weapon as the aggravating element. In the violation of protective order case, Mirabal was indicted for violating the protective order by committing aggravated sexual assault, and the indictment included a paragraph alleging that a deadly weapon was used or exhibited in the commission of the offense. The jury was charged in the abstract portion of the charge in the violation of a protective order case that aggravated sexual assault is committed "if the person intentionally or knowingly causes the penetration of the mouth of another person by the sexual

22

organ of the actor, without that person's consent, and the person uses or exhibits a deadly weapon in the course of the same criminal episode."

Mirabal argues that error is shown because the evidence demonstrated that he used or exhibited a firearm earlier in the day before the sexual assault and because if the jury considered the protective order charge first, "they would have decided the aggravated sexual assault issue without considering the actual aggravated sexual assault jury charge." Mirabal asserts that this amounts to a conviction not authorized by the aggravated sexual assault indictment.

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006).

Mirabal does not allege that any error exists in the individual jury charges given by the trial court in the aggravated sexual assault case and the violation of the protective order case. Both charges were authorized by the respective indictments in those cases; Mirabal does not argue otherwise. Mirabal cites no

23

authority, and we have located none, for the proposition that two proper jury charges authorized by the indictment in each case may become erroneous if given together. Moreover, as pointed out by the State, we must presume that the jury followed the instructions in each of the charges, authorizing them to find Mirabal guilty based only on the definitions and instruction given in that particular charge. *See, e.g.*, *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Because Mirabal has alleged no error existing in the individual jury charges and because no error exists in the individual charges given in tandem, our analysis ends. *See Kirsch*, 357 S.W.3d at 649 (if charge error did not occur, our analysis ends). We overrule Mirabal's third issue.

In his fourth issue, Mirabal argues that the trial court erred by submitting both the aggravated assault case and the unlawful restraint case disjunctively, thereby permitting a non-unanimous verdict in each case. Jury unanimity is required in all criminal cases in Texas. *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011); *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008); *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see also* Tex. Const. art. V, § 13. Every juror must agree that "the defendant committed the same, single, specific criminal act." *Ngo*, 175 S.W.3d at 745. But this does not mean that the "jury must unanimously find that the defendant committed that crime in one specific way." *Landrian*, 268 S.W.3d at 535. In other words, "[t]he unanimity requirement is not violated by instructing the jury on alternative theories of committing the same offense, in contrast to instructing the jury on two

24

separate offenses involving separate incidents." *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). A trial court may not submit "separate offenses" to the jury in the disjunctive, but a trial court may submit a disjunctive jury charge and obtain a general verdict when alternate theories or "manner and means" involve the commission of the "same offense." *Clement v. State*, 248 S.W.3d 791, 800 (Tex. App.—Fort Worth 2008, no pet.); *see also Ngo*, 175 S.W.3d at 745 (stating that the phrase "manner and means" describes how the defendant committed the specific statutory criminal act).

Addressing Mirabal's complaint that the unlawful restraint offense was charged disjunctively, we begin by recognizing that Texas Penal Code section 20.02 sets forth the offense of unlawful restraint. Tex. Penal Code Ann. § 20.02(a), (c)(2)(A) (West 2011). It provides that "[a] person commits an offense if he intentionally or knowingly restrains another person" and that the offense is a third-degree felony if "the actor recklessly exposes the victim to a substantial risk of serious bodily injury." *Id.* The jury charge for the unlawful restraint charge provided in part:

> If you find from the evidence beyond a reasonable doubt that on or about the 5th day of January, 2013, in Tarrant County, Texas, the defendant, Raul Mirabal, did then and there intentionally or knowingly by force, intimidation and deception, restrain [the complainant] without her consent by restricting the movements of [the complainant] and the defendant, Raul Mirabal, did then and there recklessly expose [the complainant] to a substantial risk of serious bodily injury *by striking her with his hand or hands, choking her,* **or** *threatening her with a firearm*, [] then you will find the Defendant guilty of felony unlawful restraint. [Emphasis added.]

25

Mirabal argues that the "or" in the charge permitted the jury to find him guilty if it found that the complainant was exposed to a substantial risk of serious bodily injury by (a) being struck with his hands, (b) being choked, or (c) being threatened with a firearm. The charge required the jury to unanimously find that Mirabal recklessly exposed the complainant to a substantial risk of serious bodily injury but set forth alternative factual means by which such exposure occurred. Because charging the jury disjunctively on alternative theories or manner and means of committing the same offense does not violate the unanimity requirement, we hold that the trial court did not err by instructing the jury in the unlawful restraint case. *See Martinez*, 129 S.W.3d at 103; *Davila v. State*, 346 S.W.3d 587, 591 (Tex. App.—El Paso 2009, no pet.) (holding unanimity requirement was not violated by jury charge that gave jury the opportunity to consider alternative means or methods by which appellant committed the core of the offense). We overrule the portion of Mirabal's fourth issue complaining of a disjunctive submission in his unlawful restraint conviction.

Addressing Mirabal's complaint that the aggravated assault offense was charged disjunctively, we begin by recognizing that Texas Penal Code section 22.01 provides that "[a] person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; [or] (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse." Tex. Penal Code Ann. § 22.01(a)(1), (2) (West Supp. 2015). Texas Penal Code section 22.02 provides

26

that "[a] person commits an offense if the person commits an assault as defined in § 22.01 and the person: . . . (2) uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2) (West 2011). Thus, aggravated bodily injury assault and aggravated assault by threat are different statutory offenses, not just two methods of committing the single offense of aggravated assault. *Marinos v. State*, 186 S.W.3d 167, 175 (Tex. App.—Austin 2006, pet. ref'd). The jury charge for the aggravated assault charge provided in part:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 5th day of January, 2013, in Tarrant County, Texas, the defendant, Raul Mirabal, did intentionally or knowingly cause bodily injury to [the complainant] by striking, pushing, grabbing, or choking her with his hand and the Defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a firearm; **or** if you find from the evidence beyond a reasonable doubt that on or about the 5th day of January, 2013, in Tarrant County, Texas, the defendant, Raul Mirabal, did then and there intentionally or knowingly threaten imminent bodily injury to [the complainant] and the Defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a firearm, then you will find the Defendant guilty of aggravated assault. [Emphasis added.]

The State concedes here that the trial court erred by instructing the jury in the disjunctive in the aggravated assault jury charge. *See id.* Because Mirabal did not object to the charge, we evaluate this error for egregious harm. *See, e.g.*, *Cosio*, 353 S.W.3d at 776–77 (holding appellant forfeited any constitution-based jury charge claim by not objecting that charge allowed for non-unanimous verdict).

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence,

27

including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Performing an egregious harm analysis, we note that the jury charge in the aggravated assault case contained a general unanimity instruction. In reviewing the state of the evidence, the record shows that the jury believed the evidence put on by the State—which included the complainant's testimony of the brutality inflicted on her by Mirabal and of the threats that Mirabal made while he exhibited the gun, numerous photographs of the complainant's injuries and medical testimony about the force necessary to cause them, and Mirabal's statement to the police admitting that he had caused the complainant's injuries—and that the jury disbelieved Mirabal's defensive evidence. During their arguments, neither the State nor Mirabal told the jurors that they must be unanimous, nor were they told that they need not be unanimous. Mirabal's counsel stated during closing argument,

28

There was an assault, there was bodily injury. We said it day one, first thing out of our mouth, we're saying it again now. We've never maintained otherwise. Okay.

. . . .

. . . There is no doubt in my mind that you are going to find him guilty of any and every single charge that causes bodily injury. No doubt whatsoever.

Looking to the actual degree of harm Mirabal suffered from the disjunctive aggravated assault charge after reviewing the entire jury charge; the state of the evidence, including the contested issues and weight of probative evidence; and the argument of counsel, we hold that charge error did not result in harm to Mirabal that affected the very basis of the case, deprived him of a valuable right, vitally affected his defensive theory, or made a case for conviction clearly and significantly more persuasive. *See, e.g., Arrington v. State*, 451 S.W.3d 834, 845 (Tex. Crim. App. 2015) (holding no egregious harm shown from charge instructions permitting non-unanimous jury verdict when State's and defense's theory of case were diametrically opposed and jury's verdicts signified its belief in the credibility of the State's evidence and its disbelief in the defendant's evidence); *see also Cosio*, 353 S.W.3d at 777–78; *Almanza*, 686 S.W.2d at 171. We overrule the remainder of Mirabal's fourth issue.

## VI. CONCLUSION

Having overruled Mirabal's five issues, we affirm the trial court's judgments.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 25, 2015